WELLLS, FARGO & COMPANY'S EXPRESS v. B. F. FULLER.

No. 7.

**1. Damages—Mental Suffering—Evidence.**—In a suit for damages by a father for breach of a contract made in his name for shipment of the corpse of his son, the mental suffering of his wife, mother of the deceased, is not a proper element of damages, when she is not a known party to the contract, and is not disclosed as a beneficiary under it. Testimony as to her mental suffering in such case is inadmissible.

**2. Shipping Contract—Route—Parol Evidence.**—It is the right of the shipper to route his shipment; if he fails to do so, that right vests in the carrier, subject to the qualification that the route selected must at its peril be a usual and reasonably safe and direct route. The receipt given by the express company in this case purports to state the terms, and contains all the necessary elements of a shipping contract, and is binding by acceptance on the shipper. It being silent as to route, the carrier is by its legal import invested with the right to properly route the shipment. Parol evidence that the shipper directed a route different from that selected by the carrier is inadmissible.

**3. Same—Negligence.**—The carrier selecting the route must have regard to the character and apparent object of the shipment, and if it fails to use that degree of care that an ordinarily prudent person would use under like conditions, it is responsible for damages proximately resulting from its negligence in the selection of the route. The action of the express company in this case in not selecting the most expeditious route is a question of negligence vel non, and should have been submitted to the jury as such.

APPEAL from Lamar. Tried below before Hon. H. B. BIRMINGHAM, Special Judge.

*M. R. Smith* and *C. P. Scott*, for appellant.—1. The court erred in overruling defendant's general exception to plaintiff's petition, for the reasons, that the damage claimed in consequence of the breach of the contract was imaginary and unsupported by the facts; because the damage claimed was not the proximate and natural result of the breaches complained of; and because the amount of actual damages claimed is not cognizable by this court; and because there can be no recovery of damages for mental anguish and pain against a common carrier for a breach of contract. Calvit v. McFadden, 13 Texas, 323; Daniel v. Tel. Co., 61 Texas, 455; Tel. Co. v. Brown, 62 Texas, 541; Rowell v. Tel. Co., 75 Texas, 27; McAllen v. Tel. Co., 70 Texas, 245; Jones v. George, 61 Texas, 346; 1 Suth. on Dam., 21–24; Hoadly v. Transfer Co., 115 Mass., 304; Railway v. Rambolt. 67 Texas, 654; Johnson v. Express Co., 6 Nev., 224; 24 Albany Law Jour., 144.

2. The court erred in overruling defendant's special exception number 3, which sought to strike out all extraneous matter made at the time the written contract sued on was made, because the same was irrelevant and contradictory of the written contract. A written contract can not

be varied, modified, or contradicted by parol agreements. Wooters v. Railway, 54 Texas, 294; Hunt v. White, 24 Texas, 643; Belcher v. Mulhall, 57 Texas, 17; Bruner v. Strong, 61 Texas, 555, Milikin v. Callahan County, 69 Texas, 210; Hutch. on Carr., secs. 243, 126; 1 Greenl. on Ev., 284a; Hinckley v. Railway, 56 N. Y., 429.

3. The court erred in paragraph number 5 of his charge, in this, that defendant was required by the terms of said charge to deliver said corpse to plaintiff at Paris, Texas, by a usual and direct route, with reasonable speed, and within a reasonable time, although such usual and direct route might pass over the lines of a connecting carrier, and out from under the control of defendant, when the law only requires a common carrier to deliver to the connecting lines of the route, unless changed by special contract, with reasonable dispatch, and with safety; and because indefinite and ambiguous; and because the evidence nowhere shows that the defendant had any knowledge whatever of Mrs. Flora Fuller, or that T. A. Fuller represented himself as acting for her. Railway v. Myrick, 107 U. S., 102; Railway v. Mfg. Co., 16 Wall., 324; Railway v. Baird, 75 Texas, 256; Hunter v. Railway, 76 Texas, 195.

4. A common carrier will be protected in using its own line in transporting freight from a point on its own line to a common point, although the distance, the entire transit by its own line, is greater than when a connecting line is used in conjunction therewith, unless by special contract it stipulates to ship by the shorter route, using such connecting line a portion of the way. Hutch. on Carr., secs. 310, 312; Transportation Co. v. Wallace, 68 Pa. St., 302.

5. Damages for mental suffering, when: Fenton v. Butts, 53 Wis., 344; Ferguson v. Davis & Co., 57 Iowa, 601; Smith v. Holcomb, 99 Mass., 552; Ford v. Jones, 62 Barb., 484; Smith v. Railway, 23 Ohio St., 10; McMahon v. Railway, 39 Md., 438; Porter v. Railway, 71 Mo., 66; Railway v. Graham, 63 Pa. St., 290; 36 Am. Rep., 303, and note.

6. The receipt given by defendant to plaintiff's agent, T. A. Fuller, at the time of shipping the corpse at Phœnix, was a bill of lading, and the contract part thereof could not be changed, varied, or contradicted by parol evidence, as was done in the trial of this case below. Womack v. Tel. Co., 58 Texas, 176; Groce v. Express Co., 100 Mass., 505; 3 Wood on Rys., sec. 425, note 2; Hutch. on Carr., sec. 248; Snider v. Express Co., 63 Mo., 377; Hart v. Railway, 112 U. S., 331.

These authorities establish, beyond question, the right to make such a contract as was made between the parties to this suit. Oppenheimer v. Express Co., 69 Ill., 62; Hutch. on Carr., secs. 126, 240 (note 1), 242; Milikin v. Callahan County, 69 Texas, 205; Chatham v. Jones, 69 Texas, 745; Railway v. Richmond, 19 Ohio, 222; Hinckley v. Railway, 56 N. Y., 429.

7. The court erred in not giving special charge number 8, offered by defendant, which presented the question to the jury whether T. A. Ful-

ler, plaintiff's agent, at the time of demanding a transfer at El Paso, Texas, of his brother's remains from defendant's lines to the line of the Pacific Express, showed himself possessed of authority sufficient to authorize defendant in making the transfer, and be protected thereby in doing so. After goods, or freights, are in transit, the route and possession can only be changed upon the terms that the shipper will forego all freight charges paid, or contracted to be paid, and that he will show, at the time and place of changing the route and possession of such freight, that he is the proper party to make such a demand. Hutch. on Carr., secs. 336, 344–350; Redf. Law of Rys., 31, 32; Express Co. v. Haggard, 37 Ill., 465; Hawkins v. Hoffman, 6 Hill, 586; Powell v. Myers, 26 Wend., 591.

*Alexander, Clark & Hall*, for appellant, on motion for rehearing.

1. It was error to allow plaintiff, B. F. Fuller, to recover damages for the mental anguish of his wife, Mrs. Flora Fuller, her mental anguish not being in contemplation of the parties when the contract was made. Levy v. Railway, 59 Texas, 563; Tel. Co. v. Kirkpatrick, 76 Texas, 217.

2. The written contract, or bill of lading, is not ambiguous, and should not be changed or contradicted by parol evidence, as was done in this case.

(1) It has become the universal practice for express companies and other carriers, at the time of the receipt of goods, to put in writing the terms upon which they are received for transportation. Such writings are commonly called "bills of lading." Shelton v. Dispatch Co., 59 N. Y., 258; Transportation Co. v. Moore, 5 Mich., 368.

(2) The "bill of lading," as a contract, is the only evidence of the undertaking, and all antecedent and contemporaneous agreements or understandings are merged therein and extinguished thereby. The contract being reduced to writing, the law presumes that the agreement between the parties is embodied therein correctly, and it can not be contradicted or changed by parol evidence, in the absence of fraud or mistake. Arnold v. Jones, 26 Texas, 335; Express Co. v. Dickson, 94 U. S., 549; Oppenheimer v. Express Co., 69 Ill., 62; Laws. on Con. of Carr., 131.

*Dudley & Moore*, for appellee.—1. We have no forms of action in Texas; the law in this State, and in all those States where the forms of action are abolished, regards and looks to the substance of the facts as stated in the petition and which constitutes the cause of complaint, and will afford the plaintiff the most ample redress which the facts will justify. The action may be regarded either in tort or contract, having regard to the character of the remedy indicated by the facts and to the most complete and ample redress which, upon the facts stated, the law can afford. In this character of cases the contract is alleged as an inducement to the action, as the foundation of the right of plaintiff and his wife to have the remains of their deceased son forwarded over and by the most direct

route; the route pointed out, designated, and agreed upon. The right to sue in one action for a breach of contract and for a tort growing out of the same transaction is well recognized in this State. Hale v. Bonner & Eddy, 82 Texas, 33; Tel. Co. v. Simpson, 73 Texas, 422; Railway v. Levy, 59 Texas, 542, and authorities; Stewart v. Tel. Co., 66 Texas, 580; Hooks v. Fitzenriter, 76 Texas, 277; 2 Am. and Eng. Encycl. of Law, 903, and authorities; Gould's Plead., 51; 1 Chit. Plead., 290–293, 363, 378, 885; Steph. Plead., 243. See Gallagher v. Bonie, 66 Texas, 265; Loper v. Tel. Co., 70 Texas, 689, on the right of the husband to sue for and recover damages to the wife.

2. It was the duty of appellant in this case to forward the body of Dixie Fuller over and by the route designated and agreed upon. The carrier is bound at his peril to obey the directions of the shipper. Had there been no agreement or designation of the route, it was the duty of appellant to forward the body by the usual and most direct route. Under the statute of this State, the appellant was entitled to and had the facilities for transporting the body over and by the direct route, and there could be no lawful reason for taking a dead body by a route some 600 miles further, over the protest and against the entreaties of the shipper. Sayles' Civ. Stats., art. 4255a; Railway v. Allison, 59 Texas, 193; Hutch. on Carr., secs. 68–71 (and authorities cited in notes), 310–312, 314–316, 209; Express Co. v. Schier, 55 Ill., 140; Laws. on Carr., secs. 11, 142; Goodrich v. Thompson, 44 N. Y., 324; 7 Am. and Eng. Encycl. of Law, 556; Wilcox v. Parmelee, 3 Sandf., 610.

3. The contract and agreement in this case for carrying the dead body over and by the route designated by the shipper was verbal and entire; a part of it only was embraced in the receipt given by appellant; the part not embraced in the receipt does not vary the terms of the receipt, but is perfectly consistent with it. It was therefore the duty of the court to construe the receipt given by appellant for the dead body, and submit the case to the jury upon the whole contract as shown by the evidence. Thomas v. Hammond, 47 Texas, 42; Bank v. Cooper, 137 U. S., 473; Railway v. Jurey, 111 U. S., 584; Cox v. Bray, 28 Texas, 259; Railway v. Scott, 72 Texas, 70; 1 Greenl. on Ev., Redf. ed., sec. 284a; 11 Am. and Eng. Encycl. of Law, 510, and authorities cited in note.

4. Where both husband and wife have suffered damages growing out of the same act or wrong, the husband may in one suit recover both damages to himself and to his wife. Railway v. Sciacca, 80 Texas, 355; Railway v. Watson, 72 Texas, 631; Railway v. Chester, 55 Ind., 297; Hopkins v. Railway, 36 N. H., 9.

FINLEY, Associate Justice.—B. F. Fuller and his wife, Flora, live in Paris, Texas. On the 23rd day of September, 1889, B. F. Fuller was notified, through telegram from D. L. Murray, of Phœnix, Arizona, of

the death at that place of his son, D. B. Fuller, a man 25 or 26 years old, and married.   This sad information he conveyed to his wife, the mother of the deceased, and they talked over the course they would pursue.   Mrs. Fuller insisted that the body of their son should be brought to their home at Paris, Texas, for burial, and this was agreed upon.   B. F. Fuller telegraphed to T. A. Fuller, another son, at Decatur, Texas, asking him if he could go to Phœnix, Arizona, and received a reply that he could and would start immediately.   He then telegraphed to D. L. Murray to have the body embalmed and await the arrival of his son, T. A. Fuller.

T. A. Fuller, in response to the request of his father, went to Phœnix, Arizona, arriving there September 26, 1889, to look after the affairs of his deceased brother and bring his body to Paris for burial.   He found the body embalmed, and he bought a metallic case and box to enclose it. He arranged with appellant to ship the remains to Paris.   He pointed out to appellant's agent upon a map the route he desired the body to be shipped, as follows:   Phœnix to Maricopa, thence over the Southern Pacific to El Paso, Texas, and from thence to Fort Worth over the Texas & Pacific Railway, and from Fort Worth by the main line of the Texas & Pacific to Dallas, and thence over the Santa Fe to Paris, or by the Transcontinental from Fort Worth to Paris.   He told the agent that the deceased was his brother; that he would accompany the remains, and wanted to get through as quick as possible.   The route as pointed out was agreed upon between him and the agent, and he notified the agent that he would buy a ticket for himself by that route.   After the talk was had about the route, the purchase of the ticket, etc., herein above detailed, he paid to the agent the express charges, amounting to $91.40, and the agent gave him a receipt for the corpse, which he accepted, but did not read.   He instructed the agent to make out the receipt in the name of B. F. Fuller, and consign the corpse to B. F. Fuller, Paris, Texas.   The receipt is as follows:

" Express charges do not include duties nor custom house expenses, which must be guaranteed by shipper.

"FREIGHT RECEIPT WELLS, FARGO & CO.'S EXPRESS.

" Value $———.   Read the conditions of this receipt.

"PHŒNIX, ARIZONA, September 27, 1889.
"Office, State of ———.

" Received from B. F. Fuller corpse, valued at ———, addressed B. F. Fuller, Paris, Texas, which we undertake to forward to the point nearest destination reached by this company on these conditions, namely: That Wells, Fargo & Co. shall not be held liable for loss or damage except as forwarders only, within their own line of communication, nor for any loss or damage by fire or casualties of navigation and inland trans-

portation (unless specially insured and so noted herein); nor for such as can be referred to the acts of God, the restraint of government, riot, insurrection, piracy, or the hazard of war; nor for default, neglect, or mishap on the part of any connecting or intermediate line, individual, corporation, or association to whom the said property may be transferred for further transmission; nor for an amount exceeding $50 on any shipment unless its true value is herein stated; nor for any amount on goods not properly packed and addressed; nor on fragile fabrics, unless plainly marked as such; nor on articles consisting of or contained in glass. That in respect to C. O. D. goods, if delivery can not be made in sixty days after consignment, this company may at its option return the same to consignor, who shall pay transportation thereon both ways. The liability of this company on said goods pending such action, and while in its custody, to be that of a warehouseman only. And it is further stipulated, that Wells, Fargo & Co. shall not be liable under this contract for any claim whatsoever unless presented in writing within sixty days from the date hereof; and that these provisions shall extend to and enure to the benefit of each individual, corporation, or association to whom the above specified property may be transferred and entrusted in order to reach its destination. The party accepting this receipt thereby agrees to its conditions.

"For the Company, C. W. Greenleaf.

"Not negotiable. Charges paid, $91.40."

Nothing was said to the agent of appellant in regard to Mrs. Flora Fuller, either as to her relation to deceased, or existence even; and the express agent did not know that the deceased had a living mother.

The way bill which accompanied the corpse read, "From Phoenix, Arizona, to Paris, Texas; Wells, Fargo & Co.'s Express." If it had been intended by the agent to be shipped from El Paso by the Texas & Pacific to Fort Worth, the way bill should have read, "B. F. Fuller, Paris, Texas, care of Pacific Express Company, El Paso, Texas."

T. A. Fuller left Phoenix at 12 o'clock m. September 27, and accompanied the remains to El Paso. He could not get a ticket through to Fort Worth at Phoenix, but did purchase one at Maricopa.

When he arrived at El Paso he had his trunks put off, and while standing on the platform he saw the corpse being handled; the express matter was being transferred to the Galveston, Harrisburg & San Antonio Railway. He made inquiry as to whether the train to which the corpse was being transferred was going to San Antonio or Fort Worth; he was replied to in a snappish manner, that it went south to San Antonio and that the corpse went with it. He then told the person in charge that he could not permit it to go that way, or to be removed out of the car; that it must go by the Texas & Pacific route. Some man standing on the plat-

form between the two cars said, take it over the Texas & Pacific track; this was in presence of appellant's agents. The person having the express matter transferred told him to see the local agent, a couple of hundred feet away, and get the corpse transferred; that it was only six or eight minutes before the train would leave for San Antonio. He went to the local transfer agent, Mr. Roll; demanded that the corpse be taken by the Texas & Pacific route; stated to him that the company had agreed to ship by that route. The agent said that he would go and see what he could do, and did go away, and returning, said that he could not transfer it to the Texas & Pacific. He told the agent the importance of expedition, that the body had been dead then five days, and insisted that it go the Texas & Pacific route. The agent told him that the body would get to Paris Monday, September 30, almost as soon as if it went over the Texas & Pacific route; that there would not be over twelve hours difference, and by a map showed the route the corpse would take. While they were talking, the Galveston, Harrisburg & San Antonio train pulled out, taking the corpse. He telegraphed his father that he would arrive with the remains Monday via Dallas; he then thought he would meet the corpse at Dallas and accompany it to Paris, Texas. He, however, went to Fort Worth, and there made inquiry of one of appellant's agents about the location of the corpse at that time, and, gaining no information, stayed over there that night and left next morning for Paris, arriving in Paris about 3 o'clock p. m. At Fort Worth he telegraphed his father that the corpse had gone by the southern route, and to have agent at Paris to ascertain when it would arrive; the father went to the agent, but got no satisfactory information from him. This information was received by the father Monday morning, and in a short time afterwards conveyed to his wife.

Had the corpse gone by the Texas & Pacific route, it would have reached Paris at the same time T. A. Fuller did, namely Monday evening at 3 o'clock. The corpse was shipped over the Galveston, Harrisburg & San Antonio route by San Antonio, about 600 miles further than the Texas & Pacific route, consuming about twenty-seven hours more time than would have been required by the Texas & Pacific route, and arrived at Paris Tuesday evening about sundown.

The father and mother were expecting the corpse to arrive Monday evening, and preparation had been made for elaborate funeral services and a christian burial. The corpse failing to arrive at the expected hour, the funeral arrangements were necessarily abandoned, and the deceased had to be buried after nightfall, with a brief and simple form of funeral service and comparatively few in attendance. The family had an extensive circle of friends and acquaintances, was of high social standing, and they desired and intended that the son should be buried in a manner in keeping with their social position. This laudable desire and purpose

could not be carried out on account of the delay in the arrival of the corpse, and the fact that it could not longer be kept out of the ground, it being in a state decomposition.

When T. A. Fuller arrived at Paris, he informed his father and mother of the circumstances of his separation from the corpse at El Paso, and that it had been carried around by the southern route by San Antonio, and was unable to tell them where it was at that time, or when it would arrive. A number of telegrams were sent, endeavoring to locate the corpse, but no definite information was obtained until about two hours before its arrival.

The father and mother suffered great distress and anguish of mind on account of the manner in which they were forced to bury their son; and they suffered great grief and anxiety on account of the separation of the body from T. A. Fuller at El Paso, and their inability to locate it up to two hours before its arrival; it almost prostrated Mrs. Fuller The undisputed evidence showed that appellant's " lines of communication " reached Paris, Texas, via the southern route by San Antonio on the Galveston, Harrisburg & San Antonio Railway; but that the Pacific Express Company operated its line from El Paso to Paris via the Texas & Pacific Railway to Fort Worth, and from there to Paris. Appellant did not operate its line over the Texas & Pacific Railway. The reason the agent of appellant at El Paso did not transfer the corpse to the Texas & Pacific Railway route, when it was demanded by T. A. Fuller, was because he did not have authority to do so under the way bill accompanying the shipment; the shipment from El Paso was made in accordance with the way bill.

T. A. Fuller expended $365 in the following items: Paid the undertaker, $50; casket, and box to enclose same, $75; paid other things in preparing corpse for shipment, $12.75; railway fare from Fort Worth to Phœnix, $42; personal expenses, $10; for telegrams prior to making contract, $10; personal expenses at Phœnix, $2.50; paid for attention to corpse, $5; paid express charges for shipping corpse, $91.40; total expenses to time of shipment in relation to the corpse, $298.65.

The balance of $365 was paid out after the shipment, and was for travelling and personal expenses on his return trip, including telegrams along the route. B. F. Fuller paid out $1 in telegraphing to locate the corpse.

*Opinion.*—This case was affirmed by the Court of Civil Appeals of the Second District, a rehearing granted, and then transferred to this court. We are not advised of the grounds upon which the court granted the motion for rehearing.

There are three questions raised by assignments of error, which we deem of controlling importance in the case and necessary for decision.

1. Can the appellee recover for the mental suffering of his wife?

2. Was the evidence admissible which tended to prove that verbal direction was given by the shipper to the carrier fixing the route of shipment, and such route agreed to by the carrier?

3. What was the privilege and responsibility of the carrier in regard to the route of shipment?

These questions correctly answered, we think, will solve all the legal difficulties in the case, and render the consideration of other points raised unnecessary.

We will consider them in the order stated:

1. The contract with the express company for the shipment of the remains of Dixey Fuller was made by T. A. Fuller, in the name of his father, the appellee, to whom the remains were consigned at Paris, Texas. Mrs. Fuller was in no way named in the contract; her relation to the deceased, even her existence, was in no way disclosed to the carrier; therefore her mental anguish and suffering could not have been reasonably in the contemplation of the express company as a probable consequence of a breach of the contract. In suits for damages based upon breach of contract, recovery may be had for such injuries only as may reasonably have been contemplated as a probable result of such breach by the party sought to be charged. That the mental suffering of the wife is not a proper element of damages in cases of this character, when she is not a known party to the contract, and is not disclosed as a beneficiary of it, we think is fully settled by our Supreme Court. Tel. Co. v. Kirkpatrick, 76 Texas, 217; Tel. Co. v. Carter, 85 Texas, 580. It was error, therefore, to admit any testimony as to the mental suffering of Mrs. Fuller.

2. Upon the payment of the express charges by T. A. Fuller, the agent of the company executed and delivered a receipt or bill of lading to him, the material part of which is as follows: "Received of B. F. Fuller corpse, valued at ———, addressed to B. F. Fuller, Paris, Texas, which we undertake to forward to the point nearest destination reached by this company, on these conditions, namely: Wells, Fargo & Company shall not be held liable for loss or damages, except as forwarders only within their own line of communication." The undertaking of the company was to forward "to the point nearest destination reached by the company." The undisputed evidence is, that the company operated its line to Paris, Texas; therefore, the obligation was identically the same as it would have been had the contract read, "we undertake to forward to the point of destination," viz., Paris, Texas. There is no language in the contract which fixes the route of shipment. The clause limiting the liability of the company to that of "forwarders only within their own line of communication" was inserted in the contract for an entirely different purpose. It merely limits the liability of the company to injuries occurring on the line operated by it, and does not confine the shipment to its own line. It is a privilege and right of the shipper to route his shipments; if

he fails to exercise this right, then the law fixes the right in the carrier, with certain imposed restrictions or limitations. In a contract of shipment which fails in express terms to provide the route, the right of the carrier to choose the route is, by force of law, impressed upon and becomes·a part of the contract as effectually as if expressed therein.

The receipt given by the express company purports to state the terms upon which the shipment was made, and though signed only by the carrier, when accepted by the shipper he became a party to it, bound by its terms. Hutch. on Carr., secs. 120, 122. It contains all the necessary elements of a shipping contract, and under well established principles it must be treated as the final agreement of the parties, into which all parol negotiations and understandings were merged, and by its terms the duties and liabilities of the parties thereto must be determined. "Resort can not be had to prior or contemporaneous parol negotiations or agreements to vary its terms." And this rule applies not only to its express provisions, but to the legal import of the contract—the further provisions which the law makes for the parties, such as the right of the carrier to route the shipment when the contract in its express terms is silent upon that point. Hutch. on Carr., secs. 126b, 127; Law of Bills of Lading (Porter), secs. 64, 65, and cases cited; Arnold v. Jones, 26 Texas, 335; The Delaware, 14 Wall., 579; White v. Ashton, 51 N. Y., 283; Creery v. Holley, 14 Wend., 26.

In the Delaware case, supra, it· was held, that a clean bill of lading, that is to say, a bill of lading which is silent as to the place of stowage, embraces an implied obligation that the goods are to be stowed under deck, the custom or usage being impressed upon the contract and becoming a part thereof. This being so, parol evidence of an agreement that the goods were to be placed on deck was inadmissible, because its effect. was to vary or contradict the terms of the written contract.

In the case of White v. Ashton, supra, the defendants contracted to transport a quantity of barley for plaintiff from Albany to New York, to be delivered in good order, "the dangers of seas alone excepted." The bill of lading was silent as to the route. There were two customary or usual routes—one the inside, or canal route; the other the outside, or ocean route. The defendants took the latter, and the barley was injured by the peril of the seas. In an action to recover damages, plaintiffs offered to prove, in substance, that before signing the bill of lading, that. with the design of effecting insurance, and knowing that it was necessary for the parties to designate a route, the defendant agreed to transport the barley by the inside route, and relying on said agreement, he caused the barley to be insured by that route, and in consequence of the taking of the other route he lost the insurance and suffered the damages claimed. It was held, that by the contract defendants had the choice of routes, and it was not competent to vary or contradict it by parol. It was error for the

court to admit the testimony of T. A. Fuller to the effect that he directed the express agent to ship the corpse from El Paso by the Texas & Pacific Railway to Fort Worth, and from that point direct to Paris, and that the agent agreed to do so.

3. In contracts of shipment which are silent in their express terms as to the matter of route, as before stated, the carrier has the right to choose the route; but this must be understood with the qualification that this selection must be made with due regard to the rights of the other parties concerned. The carrier must, at its peril, select a usual and reasonably safe and direct route. It can not arbitrarily select a known unsafe route, except at the risk of incurring liability for negligence. Express Co. v. Kountze, 8 Wall., 342; Transportation Co. v. Kahn, 76 Ill., 520. Neither can it arbitrarily choose a long, inexpeditious route, without assuming the risk of delay incident to the choice. Snow v. Railway, 109 Ind., 425; Hutch. on Carr., secs. 312, 313. The rule seems to be, that the carrier, in the exercise of this right, must use such care in relation to the shipment as an ordinarily prudent person would use under similar circumstances. The character of the goods shipped, whether perishable or not, the apparent object to be subserved by the shipment, and all the surrounding circumstances throwing light upon the shipment, must be considered by the carrier in the exercise of the right of routing, and if it fails to use that degree of care which an ordinarily prudent person would use under like conditions, it is held responsible for damages proximately resulting from its negligence in the selection of the route. Express companies transport their freight usually upon railways and other public carriers which they do not own or control; and in some instances particular express companies have been cut off from the most direct and expeditious routes by railways refusing them accommodations or discriminating against them in charges. But since the enactment of what is known as the "equal facility statute" by the Twentieth Legislature, railways in Texas are compelled, under heavy penalty, to afford equal facilities to all express companies without discrimination in charges, and express companies have the privilege of transporting their express matter over any and all railway routes in the State. Sayles' Civ. Stats., art. 4255a. With these facilities furnished them for transportation under laws of the State, if an express company, in exercising its right of routing when the shipper has failed to do so, chooses a long or inexpeditious railway route, when there is a direct and speedy line which it may use, and when the circumstances surrounding the shipment indicate that delay will be damaging, it should be held liable for any damage proximately resulting from the additional time consumed in the journey.

The action of the express company in taking the corpse around by the southern route is simply a question of negligence, and it should have been

submitted to the jury as such. We think the charge of the court in this case failed to present the case in this light to the jury, and is subject to the objection urged against the fifth paragraph of the charge.

For the errors pointed out in this opinion, the cause is reversed and remanded.

*Reversed and remanded.*